## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

MINA RAYMOND, ET AL.                                  CIVIL ACTION

VERSUS

UNUM GROUP, ET AL.                           NO. 20-00352-BAJ-EWD

### RULING AND ORDER

Plaintiffs Mina and Steven Raymond allege that Defendants New York Life Insurance Company ("NY Life"), Paul Revere Life Insurance Company ("PR Life"), and Unum Group conspired to deny Mina benefits under a Disability Insurance Policy issued by NY Life in 1988, despite Mina having left full-time employment as a Pharmacist in 1996, after being diagnosed with Multiple Sclerosis. (Doc. 38). Defendants counter that Plaintiffs defrauded them, and seek recovery of $225,578.91 in disability benefits paid under the Policy between 2014 and 2020, asserting that Mina withheld and misrepresented her actual work activities and monthly income, which, if accurately reported, would have disqualified her for any benefits.

Now, Plaintiffs seek judgment in their favor on multiple elements of their original claims, and dismissal of Defendants' counterclaims. (Doc. 173). Defendants oppose Plaintiffs' motion (Doc. 191).

For reasons set forth herein, Plaintiffs' motion will be denied. Further, in the Court's view, it now appears undisputed that Plaintiffs failed to satisfy multiple conditions required to obtain benefits under the Policy, including that, for years, Mina provided materially false information to Defendants regarding her actual

employment and income. Accordingly, the Court also will order Plaintiffs to show cause why summary judgment should not be entered in *Defendants'* favor, dismissing Plaintiffs' claims with prejudice, leaving only Defendants' counterclaims for trial.

## I.    BACKGROUND

### A. Summary Judgment Evidence

These undisputed facts are drawn from the evidence submitted in support of the parties' summary judgment papers, and the parties' joint pretrial order.

In March 1988, Mina purchased a Premier Disability Income Insurance Policy (No. H2733964) (the "Policy") from NY Life. (Doc. 202 at § (F)(1)). PR Life, a subsidiary of Unum Group, has administered Mina's claim for NY Life since August 2000. (*Id.* at §F(8), (10)).

Writ large, the Policy provided a monthly income Total Disability Benefit of $1,500 in the event that Mina became "totally disabled." (*Id.* at p. 13). The Total Disability Benefit would continue until Mina was "no longer disabled," or reached "age 65," whichever came first. (*Id.* at p. 15). The Policy conditioned the Total Disability Benefit on Mina's "total disability," meaning "the Insured can not do the substantial and material duties of … her regular job." (*Id.* at p. 16). The Policy further conditioned the Total Disability Benefit on periodic and satisfactory proof of a "continuing disability,"  stating: "You must give us written proof of disability within 90 days after the end of each period for which a benefit is payable." (*Id.* at p. 20).

As an alternative to the Total Disability Benefit, the Policy also provided a Residual Disability Benefit, which paid up to $1,500 per month in the event of "an injury or sickness" that did *not* result in "total disability," but nonetheless rendered

Mina unable "to do one or more of the substantial and material duties of … her regular job," *and* resulted in "a loss of income … of at least 20%." (Doc. 49-3 at p. 34). The Policy conditioned the Residual Disability Benefit on satisfactory proof of Mina's current monthly income, to include all "wages, salaries, bonuses, commissions, fees and other amounts that are reportable as earned income for personal income tax purposes." (*Id.* at p. 35). The Policy reserved NY Life's right to recoup any Residual Disability Benefit paid based on "misstatement of income," and further reserved the NY Life's right to request Mina's financial records and tax returns to corroborate Mina's self-reported current monthly income. (*Id.* at p. 37).

Finally, relevant here, the Policy also included a Social Insurance Supplemental Income Benefit (SIS) Benefit, which paid up to an additional $500 per month during any term of "total disability" *or* "residual disability," upon NY Life's receipt of "satisfactory" proof that Mina applied for federal, state, or local government social security benefits. (Doc. 49-3 at p. 28). The SIS Benefit "would be reduced by the amount of any benefits payable by Government Programs for the same month." (*Id.*).

At the time she purchased the Policy, Mina was a Pharmacist at Eckerd Drugs in Baton Rouge, Louisiana, working 30-40 hours per week and earning approximately $39,400 per year. (Doc. 49-3 at pp. 39-40). By her own assessment, Mina spent approximately three-quarters of her time "Filling Px's … ~25%," "Ensuring Accuracy of Px's … ~25%," and "Counseling customers about their Px's … ~25%." (Doc. 191-2 at p. 111). The remainder of her time was devoted to "Supervising other Employees … ~10%," "Transcribing Px's from Nurses + Doctors … ~5%," "Restocking drug

inventory + Re-Ordering Meds … ~5%," and "Administrative Duties (paperwork, etc.) … ~5%." (*Id.*; *accord* Doc. 174-1 at p. 7).

In August 1996, Mina was diagnosed with Multiple Sclerosis, prompting her to leave her Pharmacist position at Eckerd Drugs, and to apply for disability benefits under the Policy. (Doc. 202 at § F(6)). Mina's original October 9, 1996 Proof of Claim indicated *both* that she was claiming the Total Disability Benefit *and* that she was claiming the Residual Disability Benefit. (Doc. 174-1 at p. 3). Mina now admits that she misstated her "average monthly earnings" on her October 9 Proof of Claim, informing NY Life of her *pre*-tax earnings—"$ ~ 2000"—rather than her *after-tax* earnings. (Doc. 173-4 (hereinafter "Mina Decl.") at ¶ 5; *see also* Doc. 174-1 at p. 3).

Despite Mina's misstatement, in January 1997, NY Life began paying the monthly Total Disability Benefit ($1,500) and SIS Benefit ($500). (Doc. 202 at § F(7)). What happened in the ensuing years forms the crux of this dispute.

Shortly after NY Life began paying benefits under the Policy, Mina decided to return to work as a "part time … Pharmacy Consultant." (Mina Decl. at ¶ 14). Before doing so, however, she sought NY Life's opinion regarding what impact, if any, re-employment would have on her benefits. Initially, in a letter dated July 2, 1997, NY Life stated that based on *Mina's* description of the proposed Pharmacy Consultant position, the Total Disability and SIS Benefit would continue because Mina was not performing her "regular occupation" as a Pharmacist. (Doc. 174-1 at p. 11; *see also id.* at pp. 9-10). Thereafter, Mina returned to work as a Pharmacy Consultant, and continued to receive her monthly Total Disability and SIS Benefit. Employment

4

records provided to NY Life during Mina's part-time Pharmacy Consultant phase indicate that she "average[d] 4 work hours every two weeks," (Doc. 191-2 at pp. 116-123; *see also* Doc. 176-2 (hereinafter, "Mina Depo.") at p. 76:2-10), substantially less than the 30-40 hour work weeks Mina averaged as a full-time Pharmacist at Eckerd Drugs.

As time passed, additional work opportunities became available to Mina. In April 1998, Mina again sought an opinion from NY Life, this time regarding whether she could keep her benefits while working part-time as a Pharmacist—her pre-disability occupation. By letter dated April 23, 1998, NY Life cautioned that such employment could result in her claim being administered under the Residual Disability Rider, stating (in relevant part):

> During our phone discussion you stated there is a possibility that you will be returning work on a part-time or limited basis as a Pharmacist. Therefore, the Residual Disability rider would probably be more appropriate in administering your claim. …

> Have you decided whether you will return to work? If so, let me know when so we can start gathering the necessary financial information under your Residual Disability rider.

(Doc. 174-1 at pp. 12-13).

Two months later, on June 30, 1998, Mina submitted an application to NY Life for the Residual Disability Benefit. (Doc. 174-1 at pp. 14-17). Mina's application reflected current monthly income of just "~ $703." based on a single paycheck stub from Louisiana State University, for the pay period ending June 11, 1998. (Doc. 174-1 at pp. 15-17).

In late 2000, things began change. First, PR Life[1] discovered that Mina was not properly documenting her SIS Benefit. On January 18, 2001, PR Life sent Mina a letter seeking proof that she had applied for government social security, as required under the Policy. (191-2 at p. 107). PR Life sent a second and third letter in quick succession—on March 22, and April 6, respectively. (*Id.* at pp. 108, 110). Mina responded to these letters with a  phone call stating that she had been denied social security benefits, but did *not* provide written documentation, and in July 2001, PR Life stopped paying the monthly SIS Benefit, *without* formal notice or explanation. (Doc. 174-1 at p. 43; Doc. 202 at § F(12)). Still, even *after* PR Life discontinued the SIS Benefit, it sent Mina multiple notices requesting supporting documentation. (Doc. 191-2 at pp. 113-115). Again, Mina failed to respond. Mina now admits that for *10 years* she "did not notice" that her SIS Benefit was discontinued, "because my benefits are deposited into my joint checking account that I share with my husband Steve. Steve manages the account." (Doc. Mina Decl. at ¶ 29; *see* Doc. 173-5 at ¶ 10).

At the same time that PR Life was requesting documentation to support Mina's SIS Benefit, Mina was again seeking PR Life's approval to return to work as a part-time Pharmacist. By letter dated May 31, 2001, PR Life conditionally approved Mina's request to work as an "on-call floating pharmacist" at Eckerd Drugs—Mina's pre-diagnosis employer—stating that her Total Disability Benefit would continue if she worked in a "limited capacity." By this same letter, however, PR Life expressly "reserve[d] the right to review [Mina's] claim under the Residual Disability provision"

---

[1] As stated, PR Life began administering Mina's claim for NY Life in August 2000.

if her hours increased:

> Based on our review of your claim file, it appears that you are working in a limited capacity. Since the hours you are working per month are minimal, we have made a decision to continue to consider benefits under the Total Disability provision of your policy. However, we will require that you inform this office of the hours you work each month. This information may be provided on the progress report that is enclosed with each month's benefit check. Should the hours that you work increase, we reserve the right to review your claim further under the Residual Disability provision of your policy.

(Doc. 174-1 at p. 34).

In September 2001, Mina changed jobs again, taking a part-time Pharmacist position at Bolton Health Mart in Baton Rouge, where she continues to work to this day. (Doc. 178-2 at ¶¶ 3-4). At Bolton Health, Mina's weekly work hours increased to "15-20 hours per week." (Doc. 178-2 at ¶ 8). In "mid-2014," Mina's hours increased again, to "20-25 hours per week." (*Id.*). Mina's job responsibilities also expanded, to include many of the same duties she performed as a full-time Pharmacist, prior to her diagnosis. Mina now describes her duties at Bolton Health as follows: "Mina Raymond has performed the following duties at Bolton Health Mart and/or Our Lady of the Lake":

- Occasionally packing and labelling pharmaceuticals (when necessary because a technician is unavailable);

- Checking prescriptions for accuracy and safety;

- Reviewing and interpreting physician orders and detecting therapeutic incompatibilities;

- Providing information to patients and responding to their questions about medications and their use, including interactions and side effects;

- Communicating with physicians;

7

- Maintaining records for controlled substances;

- Rarely compounding medications.

(Doc. 191-6 at pp. 4-5; *accord* Doc. 178-2 at ¶ 5). Steven Yellot, Mina's supervisor at Bolton Health, adds that Mina "also oversees [Bolton's] insurance audits." (Doc. 178-2 at ¶ 5).

Despite materially increasing her hours and responsibilities at Bolton Health, Mina did not inform PR Life of the same, at least not initially. To the contrary, for *10 years* Mina's required annual Disability Status Update (DSU) forms failed to state her hours or her monthly income, and indicated only that she was "working on a limited basis as approved by New York Life and PR Life" (or some variation of the same). (*See* Mina Depo. at pp. 88:22-94:3).

Beginning in 2011, PR Life took a more active interest in Mina's claim, her employment, and her income, even sending claims representatives to Mina's house to interview her in-person. In November 2011, at the first interview, Mina reported (inaccurately) that she "work[ed] 1 to 3 times each month," and that "[h]er hours var[ied] from 3 to 5 hours per week." (Doc. 174-1 at p. 58). Mina also stated that she earned $38 per hour. (*Id.*).

In October 2012, at the second interview, Mina provided a more complete account, stating that she worked at Bolton Health "Mondays and Wednesdays from 8:00 A.M. until 3:00 P.M.," that she earned "$40 an hour," and that her "job duties include[d] document reviews and compliance, as well as filling prescriptions and working with customers … managing employees, audits and inventory management[,] … paperwork and insurance audits." (Doc. 174-1 at p. 69). Mina also

reported that "once or twice every two to three months she work[ed] from 8:00 A.M. to 3:00 P.M" "on-call at the pharmacy of Our Lady of the Lake Medical Plaza," earning "$57 per hour," and that "twice a month" she operated a phone bank for Teva Pharmaceuticals, acting as "a patient advocate" and earning "about $20 for each call." (*Id.*). Still, despite learning from this interview that Mina was working far more than previously reported, and even performing many of the same duties that she performed pre-diagnosis as a full-time Pharmacist, PR Life did *not* re-determine Mina's eligibility for the Total Disability Benefit. Instead, bizarrely, by letter dated November 16, 2012, PR Life *re-instated* Mina's SIS Benefit, determining based on Mina's reported employment and income that she "would not be eligible for Government Programs." (Doc. 174-2 at p. 1).

Mina's 2013 DSU form followed the pattern of the preceding years, acknowledging that Mina was working "Part-Time," yet failing to state her hours or her monthly income, indicating instead that she was working "as permitted by Unum." (Doc. 191-2 at p. 61).

Thereafter, Mina's annual DSU forms became more descriptive, if not more accurate. In 2014, Mina reported working "~20" hours per week. (*Id.* at p. 66). Still, Mina did not disclose her monthly income, instead stating: "It varies. I work on-call as approved by Unum." (*Id.*).

In 2015, Mina reported working "~15" hours per week "As approved by Unum/NYL," and earning "~$2,500" monthly, *before* taxes. (*Id.* at p. 71).

In 2016, Mina reported working "~20" hours per week "on an on-call basis,"

9

"As permitted by Unum's representative," and earning "~$3,000" monthly, *before* taxes. (*Id.* at p. 75).

In 2017, Mina reported working "~10-20" hours per week "on-call," "As permitted by Unum," and earning "~$1,200" monthly, *before* taxes. (*Id.* at p. 78).

Mina signed each of these annual DSU forms, certifying that "[t]he above statements are true and complete to the best of my knowledge and belief," and acknowledging "that should my claim be overpaid for any reason it is is [sic] my obligation to repay any such overpayment." (*Id.* at pp. 70, 72, 76, 79).

Candidly, Mina now *admits* that her statements on the DSU forms regarding her monthly hours *and* her monthly income were *not* accurate. First, Mina concedes that she consistently under-reported her work hours, admitting that since 2011 she has worked a *minimum* of 15 hours per week at Bolton Health. (Mina Depo. at pp. 151:4-153:7). Additionally, since 2014, Mina has received 40 hours "paid vacation" and 40 hours paid "sick leave" annually. (*Id.* at pp. 153:8-154:23). These concessions are consistent with the account of Mina's work activities submitted by her supervisor, Mr. Yellot. (Doc. 178-2 at ¶ 8).

Additionally, Mina now admits that she *substantially* underreported her income to PR Life, by providing only *after*-tax *estimates* of monthly paychecks from Bolton Health, and by failing altogether to disclose income from *other* sources:

> I have reviewed my 2013-2017 claim forms and I believe I mistakenly reported net income by pay period in 2015, 2016, and 2017 from Bolton, instead of my gross income as shown on my tax returns. I did not report employment with or income earned from [my husband] Steve's dental practice as an officer of the corporation on any of her [sic] claim forms, since the limited duties I performed for the practice was not [sic] related

10

to my profession. I did not refer to my tax returns at the time I was
completing any of these forms, and I did the best I could with providing
a rough estimate by relying on my recollection of the paychecks I
deposited recently. I did not believe that the questions about income
were material to my claim, and I was aware that PR Life and Unum
Group had a full copy of my tax return from my meeting with their
investigator in 2012 if they wanted to confirm the information.

(Mina Decl. at ¶ 36).

Beginning November 28, 2018, PR Life attempted to verify Mina's "work
activities and earnings" set forth on her annual DSU forms. (Doc. 174-2 at p. 12).
Initially, PR Life requested Mina's 2017 tax returns, W-2s, K-1s, and 1099s, and year-
end pay stubs. (*Id.*). Thereafter, by letter dated April 5, 2019, PR Life requested the
same documents for the years 2014, 2015, 2016, and 2018, as well as contact
information for a manager at Bolton Health "who can verify your title, job duties, and
hours worked." (*Id.* at p. 13). In support of these requests, PR Life cited the Policy's
"**Proof of Disability or Loss**" clause, requiring "written proof of disability within
90 days after the end of each period for which a benefit is payable." (*Id.*).

On May 29, 2019, Mr. Yellot responded to PR Life's inquiries, stating that Mina
works "20-25" hours per week, and describing Mina's job responsibilities as follows:

As a pharmacist, Mina verifies the accuracy of filled prescriptions. This
involves mostly computer work as the prescriptions are filled by
technicians. She also performs our medication therapy management
(MTM). This involves assessing a patient's medication profile and
making appropriate recommendations to the patient or physicians. She
also oversees our insurance audits. Most of this work is accomplished
while sitting at a computer to accommodate for the fatigue and
weakness that occurs.

(*Id.* at pp. 5-6).

Even after receiving this information, PR Life continued paying Mina the

11

monthly Total Disability and SIS Benefit, albeit "under Reservation of Rights," and while requesting additional employment and financial records. (*See* Doc. 174-2 at pp. 17, 32).

By letter dated January 14, 2020, PR Life informed Mina that, based on the additional documentation obtained, she was not eligible for the Total Disability Benefit under the Policy for, *at minimum*, the years 2014 through 2019, because "[d]espite your reported restrictions and limitations, you continue to work in a reduced capacity in your Regular Job as a Pharmacist." (Doc. 174-2 at p. 47; *id.* at pp. 43-47). Further, PR Life determined that Mina also was not eligible for the Residual Disability Benefit for these years, because Mina's *actual* monthly income was not reduced by at least 20 percent. (*Id.* at p. 46). And, because Mina was not eligible for the Total Disability Benefit *or* the Residual Disability Benefit during this period, she also was not eligible for the SIS Benefit. To top it off, based on its re-determination that Mina was *not* eligible for *any* benefits under the Policy for the years 2014 through 2019, PR Life informed Mina that she had been overpaid $222,318.91. (*Id.* at p. 47).

Finally, by letter dated March 31, 2020, PR Life closed Mina's claim, discontinued all benefits under the Policy, and demanded return of the previously estimated overpayment of $222,318.91, *plus* an additional overpayment of $3,260.00 for a Residual Disability Benefit mistakenly paid on February 3, 2020—or $225,578.91 total (the "Overpayment"). (Doc. 174-2 at pp. 53-60).

### B. Procedural History

On April 24, 2020, Plaintiffs initiated this action in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana, challenging Defendants'

re-determination of Mina's claim under the Policy, and alleging various additional unlawful acts. (Doc. 1-1). On June 10, 2020, Defendants removed Plaintiffs' action to this District, invoking diversity jurisdiction under 28 U.S.C. § 1332. (Doc. 1).

Plaintiffs operative Third Amended Complaint alleges breach of contract and various torts, and seeks (among other things) recovery of past SIS Benefits allegedly due for the period of July 2001 until January 2013; future disability benefits; compensation for mental and emotional distress; statutory penalties; punitive damages; and attorney's fees. (Doc. 38 at ¶¶ 94-103).

In turn, Defendants allege counterclaims of fraud, negligent misrepresentation, unjust enrichment, and payment of a thing not owed, seeking recovery of the $225,578.91 paid to Mina between 2014 and 2020, contending that during this period Mina misrepresented her employment activities and monthly income, which if accurately reported, would have disqualified her for benefits under the Policy. (Doc. 9 at pp. 17-24).

Now, Plaintiffs seek judgment in their favor on multiple elements of their original claims against Defendants—specifically, that: (1) Mina is "permanently disabled" under the Policy; (2) the Residual Disability Rider is inapplicable and Mina's income is immaterial to any issue of coverage under the Policy; and (3) Defendants' March 2020 cancellation of Mina's claim and demand for reimbursement of the Overpayment is arbitrary and capricious, triggering statutory penalties under La. R.S. 22:1821. (*Id.* at pp. 25-35). Additionally, Plaintiffs seek dismissal of Defendants' counterclaims. (Doc. 173-1 at pp. 14-25). Defendants oppose Plaintiffs' motion. (Doc. 191).

## II.    LAW AND ANALYSIS

The summary judgment standard is well-set: to prevail, Plaintiffs must show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making this assessment, the Court must view all evidence and make all reasonable inferences in the light most favorable to Defendants—the non-moving parties. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 824 (5th Cir. 2022). Even so, Defendants' evidence must be concrete: "A non-movant will not avoid summary judgment by presenting speculation, improbable inferences, or unsubstantiated assertions." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (quotation marks omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (at summary judgment the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

"Conversely, when it is apparent from the summary judgment evidence that the moving party cannot prevail on its claim, the Court may enter summary judgment *sua sponte* 'provided the losing party has been given adequate notice and opportunity to respond.'" *Dandridge v. St. Germain*, No. 19-cv-00529, 2021 WL 1222805, at *3 (M.D. La. Mar. 31, 2021) (Jackson, J.) (quoting *Scott v. Mississippi Dep't of Corr.*, 961 F.2d 77, 79 n.5 (5th Cir. 1992)), *aff'd*, 2021 WL 4948924 (5th Cir. Oct. 22, 2021).

Applying this framework, clearly Plaintiffs are *not* entitled to summary judgment in their favor, even on a limited basis. To the contrary, it appears that Defendants may be entitled to judgment against Plaintiffs.

14

## A. Plaintiffs cannot obtain judgment on their original claims

Plaintiffs' request for judgment that "Mina is permanently disabled under the terms of the Policy" is a nonstarter. First, the Policy does not speak in terms of "permanent" disability, so whatever is meant by "permanently disabled," it has no bearing on the Court's analysis of Mina's entitlement to benefits under the Policy. *See Richard v. Anadarko Petroleum Corp.*, 850 F.3d 701, 713 (5th Cir. 2017) ("An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." (quotation marks omitted)).

Instead, the Policy speaks in terms of "total disability," expressly defined to mean that "the Insured can not do the substantial and material duties of … her regular job." (Doc. 49-3 at p. 16 at p. 16). The Policy defines "regular job" to mean "the occupation … in which the Insured is engaged when the disability starts." (*Id.*). By contrast, the Policy does *not* define the term "substantial and material duties"; accordingly, this term is afforded its "ordinary and generally accepted meaning." *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 453 (5th Cir. 2007). Interpreting almost *identical* policy language, the U.S. Court of Appeals for the Fifth Circuit has held that "a claimant is totally disabled only if he or she cannot perform each and every material and substantial duty of his or her occupation." *Id.* (citing *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 272 (5th Cir. 2004)).

Prior to her diagnosis, by her *own* account, Mina spent *85 percent* of her time as a Pharmacist (at Eckerd Drugs) filling prescriptions, ensuring the accuracy of prescriptions; counseling patients; transcribing prescriptions from medical

15

professionals; and performing administrative duties. (Doc. 191-2 at p. 111). Post-diagnosis, Mina *concedes* that she continues to perform *all* of these duties as a Pharmacist at Bolton Health, albeit in a part-time capacity. (Doc. 191-6 at pp. 4-5; *accord* Doc. 178-2 at ¶ 5). Indeed, it appears that the only duties Mina no longer performs are "Supervising other Employees," and "Restocking drug inventory + Re-Ordering Meds," which accounted for only 15 percent of her time at Eckerd Drugs. (Doc. 191-2 at p. 111). Plainly, the undisputed evidence undermines any argument that Mina "cannot perform each and every material and substantial duty of … her occupation" as a Pharmacist. *House*, 499 F.3d at 453.

Plaintiffs' request for a determination that "the terms of the Policy's Residual Disability Rider are inapplicable and Mina's income is immaterial to any issue of coverage under the Policy" is equally spurious. Unlike the Total Disability Benefit—which required proof of Mina's inability to perform *any* of the material duties of a Pharmacist, *id.*—the Residual Disability Benefit was available to Mina if she could still perform *some but not all* of the "substantial and material duties of" a Pharmacist, *provided that* she suffered a loss of monthly income of at least 20 percent. *See House*, 499 F.3d at 453 (interpreting a nearly identical policy—providing for both "Total Disability Benefits" and "Partial Disability Benefits"—and holding that "[a] claimant is … partially disabled under this policy if able to perform one or more, but not all, of the material and substantial duties of his or her occupation."). Obviously, for the Policy to make sense, the Total Disability and Residual Disability provisions must be read *in pari materia*, and are "mutually exclusive." *See id.*

Again, by her own account, Mina continues to perform substantially *all* the

duties of a Pharmacist at Bolton Health. Still, she has given up at least two material duties: specifically, supervising employees and restocking inventory. Under these facts, the Residual Disability Benefit is plainly at issue. And, of course, to obtain the Benefit, Mina was required to accurately report her current monthly income to Defendants, to include all "wages, salaries, bonuses, commissions, fees and other amounts that are reportable as earned income for personal income tax purposes." (Doc. 49-3 at p. 35). As such, Mina's income obviously *is* material to a determination of coverage under the Policy.

Finally, to prevail in their claim for statutory penalties under La. R.S. 22:1821, Plaintiffs must show that Defendants lacked "just and reasonable grounds for refusal to pay insurance policy benefits." *See Hyatt v. Mut. of Omaha Ins. Co.*, 2014-282 (La. App. 3 Cir. 10/1/14), 149 So. 3d 406, 417. As explained, Mina's pre- and post-diagnosis work activities are essentially the same; the only material difference is that now she works fewer hours per week at Bolton Health (20-25 hours) than she did before at Eckerd Drugs (30-40 hours). On these facts, a legitimate dispute exists regarding whether Defendants were required to pay *any* Benefits under the Policy, beginning as early as 2001 (when Mina first started at Bolton Health), particularly given Mina's admissions that for years she withheld and materially misrepresented her work activities and income. An insurer obviously is not required to pay—and may recover—benefits that are not owed. It follows that a genuine dispute exists regarding whether Defendants' re-determination of Mina's benefits *and* attempts to recover the Overpayment were reasonable actions under the Policy.

17

## B. Plaintiffs cannot obtain judgment dismissing Defendants' counterclaims

The undisputed evidence also precludes judgment on Defendants' counterclaims. First, Plaintiffs seek a ruling that Defendants' waived any claim for return of the alleged Overpayment. (Doc. 173-1 at p. 15). Waiver, however, requires proof of "intentional relinquishment of a known right." *Steptore v. Masco Const. Co.*, 93-2064 (La. 8/18/94), 643 So. 2d 1213, 1216. Here, under the Policy, NY Life reserved the right to recoup any Residual Disability Benefit paid based on "misstatement of income." (Doc. 49-3 at p. 37). Additionally, in May 2001, PR Life expressly "reserve[d] the right to review [Mina's] claim further under the Residual Disability provision," in direct response to Mina's request for permission to return to work at Bolton Health. (Doc. 174-1 at p. 34). Thereafter, for 10 years Mina obscured her actual work activities *and* income in her annual DSU reports. (*See* Mina Depo. at pp. 88:22-94:3).

True, in October 2012, PR Life obtained a more accurate picture of Mina's employment, when a claims representative interviewed Mina and discovered that she was working at least two days per week at Bolton Health, was also picking up shifts at Our Lady of the Lake, and was performing essentially the same tasks she performed at Eckerd Drugs. (Doc. 174-1 at p. 69). And again, strangely, PR Life responded to this information by *continuing* Mina's Total Disability Benefit *and re-instating* Mina's SIS Benefit, rather than re-determining Mina's eligibility under the Residual Disability Benefit. (Doc. 174-2 at p. 1).

But in the ensuing years, Mina's annual DSU forms returning to the old pattern, consistently withholding and even misrepresenting her actual work

activities and income. (Doc. 191-2 at pp. 61, 66, 71, 75, 78). Mina signed each of these annual DSU forms, certifying that her statements were "true and complete," and expressly acknowledging "that should my claim be overpaid for any reason it is is [sic] my obligation to repay any such Overpayment." (*Id.* at pp. 70, 72, 76, 79). Clearly, a material dispute precludes a ruling that Defendants waived their right to recoup the alleged Overpayment.[2]

Next, Plaintiffs insist that somehow Defendants' claims fail because they "cannot prove the debt owed by Mina." (Doc. 173-1 at pp. 15, 20-23).[3] The "debt" at issue is simply the alleged Overpayment that occurred between January 3, 2014 and February 3, 2020, based on Mina's receipt of Total Disability and SIS Benefits *not* owed during this period. Proving this sum is merely a question of arithmetic, determined by subtracting what Defendants paid Mina from what Defendants

---

[2] Plaintiffs also assert in passing that Defendants are "equitably estopped from contending that Mina was not entitled to receive Total Disability and SIS Benefits as a result of her work at Bolton." (Doc. 173-1 at p. 17). "Although similar, waiver and equitable estoppel are not the same." *Landmark Am. Ins. Co. v. Esters*, 600 F. Supp. 3d 677, 689 (W.D. La. 2022) (Doughty, J.). Plaintiffs fail to offer any distinct argument or authority to support a determination that Defendants are equitably estopped from recovering the alleged Overpayment, and this Court has repeatedly warned that it will not develop arguments on a party's behalf. Pursuant to this Court's Local Civil Rules, Plaintiffs have waived their equitable estoppel defense at this stage. *See, e.g.*, *Buchicchio v. LeBlanc*, No. 22-cv-00147, --- F.Supp.3d ----, 2023 WL 2027809, at *10 n.6 (M.D. La. Feb. 15, 2023) (Jackson, J.).

[3] Separately, Plaintiffs argue that Defendants cannot recover the alleged Overpayment because there is no evidence of contractual subrogation (assignment) of NY Life's rights under the Policy to PR Life and/or Unum Group. (*See* Doc. 173-1 at pp. 18-20). This is a red herring. Subrogation is not at issue here because NY Life, PR Life, *and* Unum Group are all parties to the dispute. Obviously, one of these entities may recoup the alleged Overpayment, where all agree that NY Life issued the Policy in 1988, that PR Life has administered Mina's claim since 2000, and that PR Life is Unum Group's wholly owned subsidiary. (Doc. 202 at § (F)(2), (8)-(10)).

actually *owed* Mina under the Policy.

What Defendants paid is easy: Patricia Lynch, a Certified Public Accountant and Unum Group's Senior Financial Risk Consultant, pegs this number at $225,578.91, (Doc. 191-4 at ¶ 2), and Plaintiffs do not dispute it.

What Defendants actually owed is a more involved inquiry, but hardly beyond determination. Under the Policy, the answer hinges on two questions of fact: whether Mina's actual work activities excluded her from the Total Disability Benefit, and, if so, whether Mina's income also excluded her from the Residual Disability Benefit. As discussed, it is undisputed that, at Bolton Health, Mina performs essentially the same duties that she previously performed at Eckerd Drugs, before her diagnosis, establishing a basis to conclude that Mina was *not* entitled to the Total Disability Benefit between 2014 and 2020. Further, based on her review of Mina's "2014-2019 tax returns and W-2's and the provisions set forth in the policy," Ms. Lynch states that Mina's *actual* monthly income exceeds the threshold required to trigger the Residual Disability Benefit for this period, rendering Mina ineligible for this Benefit "during those years based on her earnings." (Doc. 191-4 at ¶ 3). Again, this evidence is sufficient to create a fact issue defeating summary judgment.

Finally, Plaintiffs insist that Defendants lack "evidence that Mina made any material misrepresentations with the specific intent of defrauding." (Doc. 173-1 at p. 15, 23-25). Remarkably, Plaintiffs take this position despite Mina's *admissions* that, for years, she withheld and misrepresented her actual work activity and income. Whether Mina's undisputed omissions and misrepresentations were *intended* to

defraud Defendants is obviously *not* an appropriate issue for summary judgment, "because it so depends on the credibility of witnesses." *D & J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 205 (5th Cir. 2010) (quotation marks omitted).

### C. The Court's initial review of the evidence indicates that Defendants may be entitled to summary judgment

As set forth, Plaintiffs' evidence fall well short of the standard required for judgment in their favor. To the contrary, having now reviewed the evidence, it appears that Plaintiffs may not be able to prove *any* of their claims against Defendants, and that, accordingly, Defendants may be entitled to summary judgment in *their* favor, dismissing Plaintiffs' claims.

First, Plaintiffs' contract-based claims seek only "[l]oss of future benefits" under the Policy, and "loss of past SIS Benefits that were due to [Mina] … for the period July 2001 until January 2013." (Doc. 38 at ¶ 97(a)-(b). But any future benefits owed under the Policy must necessarily be conditioned on Mina qualifying for *either* the Total Disability Benefit *or* the Residual Disability Benefit. For reasons explained, Mina's claim to a future Total Disability Benefit likely fails because Mina now performs essentially the same duties at Bolton Health that she performed at Eckerd Drugs, before her diagnosis. In turn, her claim to a future Residual Disability Benefit likely fails because she makes more money than is allowed under the Policy.

Plaintiffs' claim to "loss of past SIS Benefits that were due … for the period July 2001 until January 2013" appears equally flawed. The Policy conditioned the SIS Benefit upon satisfactory documentation that Mina applied for government benefits. (Doc. 49-3 at p. 28). "Without this proof … we can not consider payment for

benefits under this rider." (*Id.*). It is undisputed that Mina failed to provide such proof for the period in question. Rather, after ignoring PR Life's repeated requests for documentation, Mina "did not notice" that the SIS Benefit was discontinued. (Doc. Mina Decl. at ¶ 29; *see* Doc. 173-5 at ¶ 10).

Plaintiffs' claims of unjust enrichment, abuse of right, and tortious interference with contract appear equally doomed. These claims are essentially variations of Plaintiffs' contract-based claims, seeking compensatory damages due to Defendants having unfairly investigated and re-determined Mina's eligibility for benefits. (Doc. 38 at ¶¶ 89-90, 93, 100-103). But, again, Mina's undisputed work activities favor a determination that she is *not* qualified for the Total Disability Benefit, and Mina's undisputed income favors a determination that she is not entitled to the Residual Disability Benefit. In short, if Mina's claims for breach of the Policy fail, it follows that Plaintiffs cannot recover for quasi-contract and tort claims arising from Defendants efforts to investigate Mina's work activities and income, to redetermine Mina's eligibility for benefits, and to recover benefits paid but not owed. Similarly, if Mina's claims for breach of the Policy fail, it follows that Defendants' efforts were reasonable, and *not* arbitrary and capricious, as required to recover statutory penalties or punitive damages.

The same goes for Plaintiffs' final claims of invasion of privacy and intentional infliction of emotional distress (IIED). Plaintiffs allege invasion of privacy based on Defendants' demands for Mina's "private tax and income information." (Doc. 38 at ¶ 81). Plaintiffs allege IIED based on Defendants' "harassment by repeated requests

22

for protected financial information," as well as Defendants' "threats of recovery for past due benefits." (Doc. 38 at ¶¶ 81, 91-92). But "[a]n actionable invasion of privacy occurs only when the defendant's conduct is unreasonable and seriously interferes with the plaintiff's privacy interest." *Juge v. Springfield Wellness, L.L.C.*, 2018-0736 (La. App. 1 Cir. 2/28/19), 274 So. 3d 1, 8, *writ denied*, 2019-0513 (La. 5/28/19), 273 So. 3d 309. Similarly, "[l]iability for intentional infliction of emotional distress does not attach where the defendant has done no more than to insist upon his legal rights in a permissible way, even though he is aware that such insistence is certain to cause emotional stress." *Cook v. Am. Gateway Bank*, 2010-0295 (La. App. 1 Cir. 9/10/10), 49 So. 3d 23, 36. Here, the Policy expressly allowed Defendants to request Mina's "income statements, copies of income tax returns, audit reports, payroll records, accountant's statements and any other records which contain the facts we need," and to re-determine Mina's eligibility for benefits in the event Mina misstated her income. (Doc. 49-3 at p. 37). Thus, it appears that Defendants' demands for Mina's "private" financial information and for return of the disputed Overpayment were permissible *and* reasonable—particularly after Defendants discovered Mina's pattern of withholding and misrepresenting her employment activities and income—defeating Plaintiff's invasion of privacy and IIED claims.

## III.   CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiffs' **Motion For Partial Summary Judgment (Doc. 173)** be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that, consistent with the Court's initial determination that Plaintiffs likely cannot establish actionable claims due to having failed to satisfy multiple conditions for payment of benefits under the Policy, and for having provided materially false information regarding Mina's work activities and income, Plaintiffs shall show cause, if any exists, why summary judgment should not be entered in Defendants' favor, dismissing Plaintiffs' claims with prejudice. *See Dandridge*, 2021 WL 1222805, at *3. Plaintiffs' show cause memorandum shall cite specific record evidence establishing a genuine dispute as to the material facts underlying each of their claims, shall be limited to 15 pages, and shall be submitted within 14 days of the date of this Order. Plaintiffs' failure to timely submit a show cause memorandum will be deemed a waiver, and will result in *sua sponte* dismissal of Plaintiffs' claims, leaving only Defendants' counterclaims for trial.

**IT IS FURTHER ORDERED** that Defendants may submit a response to Plaintiffs' show cause memorandum, also limited to 15 pages. Defendants' response shall be due within 14 days of service of Plaintiffs' memorandum. No reply memoranda will be allowed.

**IT IS FURTHER ORDERED** that Plaintiffs' motions seeking to overturn rulings of the Magistrate Judge related to certain discovery issues **(Docs. 206, 215)** be and are hereby **TERMINATED**, pending the Court's review of the parties' show cause memoranda. Plaintiffs may resubmit these motions (as appropriate) if the Court determines that summary judgment should *not* be entered dismissing Plaintiffs' claims.

24

No additional discovery will be permitted pending a decision regarding whether Plaintiffs' claims should be dismissed.

Baton Rouge, Louisiana, this **16th** day of March, 2023

_____
JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA